*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 39**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ANDREW LEBEAU,
*Petitioner,*

*v.*

STATE OF UTAH
*Respondent.*

No. 20120829
Filed September 19, 2014

On Certiorari to the Utah Court of Appeals

Third District, West Jordan
The Honorable Terry L. Christiansen
No. 091400631

Attorneys:

Joan C. Watt, Brittany D. Enniss, Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., Jeanne B. Inouye, Asst. Att'y Gen.,
Salt Lake City, for respondent

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
and JUSTICE DURHAM joined.

JUSTICE LEE filed a dissenting opinion.

JUSTICE PARRISH, opinion of the court:

## INTRODUCTION

¶ 1    On certiorari, petitioner Andrew LeBeau asks us to consider whether the court of appeals erred in affirming the district court's imposition of a sentence of life without the possibility of parole following Mr. LeBeau's conviction for aggravated kidnapping pursuant to Utah Code section 76-5-302. Mr. LeBeau's conviction stems from a domestic dispute triggered by Mr. LeBeau's suspicion that his then-girlfriend, Stephanie, was engaged in an affair with another man. At trial, Mr. LeBeau was convicted of aggravated

kidnapping, aggravated assault, and cruelty to an animal.[1] The district court imposed a sentence of life without the possibility of parole (LWOP) for the aggravated kidnapping conviction, which was to run consecutively to Mr. LeBeau's lesser sentences for the other convictions.

¶ 2    Mr. LeBeau unsuccessfully challenged his sentence of LWOP before the court of appeals. He now argues that the court of appeals erred when it affirmed the district court's imposition of LWOP because the district court failed to properly consider whether the interests of justice warranted a lesser sentence as allowed for in Utah's aggravated kidnapping statute. Because we conclude that the district court improperly applied the sentencing provisions of section 76-5-302 of the Utah Code, we reverse Mr. LeBeau's sentence of LWOP and remand for new sentencing.

## BACKGROUND

¶ 3    In early 2009, Mr. LeBeau and Stephanie were living together, but they were experiencing trouble in their relationship. Stephanie had moved out of their shared home for a period of time before returning and, according to Mr. LeBeau, had been unfaithful during the relationship. Both Stephanie and Mr. LeBeau struggled with drug addiction. In early February, Stephanie moved out of the couple's shared bedroom but continued to live in the house.

¶ 4    The couple was acquainted with a man named Mark, from whom they occasionally purchased drugs. In February 2009, Mr. LeBeau began to suspect that Stephanie was having an affair with Mark. On February 23, 2009, Stephanie spent the afternoon and evening with Mark. Mr. LeBeau repeatedly called Stephanie and sent her text messages, but she ignored him. When Stephanie returned home sometime between 10:30 and 11:00 that night, Mr. LeBeau angrily confronted her about where she had been. Stephanie testified that Mr. LeBeau became violent when she refused to explain where she had been and began hitting and choking her.

¶ 5    As the argument escalated, Mr. LeBeau forced Stephanie to accompany him to the garage, where he threatened to bind her with duct tape and continued to behave violently. Mr. LeBeau placed his dog in the back seat of Stephanie's car before forcing Stephanie to get into the front seat, telling her they were going for a

---

[1] Prior to trial, Mr. LeBeau also pled guilty to failure to respond to an officer's signal to stop.

"fast ride." Mr. LeBeau then got into the driver's seat and began to drive toward Mark's house.

¶ 6     As Mr. LeBeau drove, he attracted the attention of Sergeant Marcelas Rapela of the Midvale Police Department. Sergeant Rapela began to follow the couple's car, ultimately signaling Mr. LeBeau to stop with lights and siren. Stephanie testified that she repeatedly asked Mr. LeBeau to pull over. Rather than stopping, Mr. LeBeau continued toward Mark's house. Mr. LeBeau initially turned onto Mark's street heading in the wrong direction. While turning the car around, Mr. LeBeau nearly crashed into Sergeant Rapela's patrol car and accelerated rapidly toward Mark's house.

¶ 7     As the car accelerated, Stephanie opened the passenger door in an attempt to jump from the car. Officer David Wilson, who had arrived to assist Sergeant Rapela, observed Stephanie's foot dragging along the road as the car accelerated. As the car raced down Mark's street at approximately sixty miles per hour, it collided with Mark's box-style truck, which was parked at the end of the street.

¶ 8     Stephanie was thrown from the car on impact. Officer Wilson testified that he observed Stephanie's body ricochet off the passenger-side door as the collision occurred. Stephanie suffered extensive injuries, including a broken eye socket, fractured femur, fractured pelvis, broken arm, and shattered ankle. Mr. LeBeau's dog was also injured in the crash and required surgery. Mr. LeBeau did not suffer any significant injuries.

¶ 9     The State charged Mr. LeBeau with aggravated kidnapping based on the serious bodily injury Stephanie suffered, attempted murder, aggravated assault, failure to respond to an officer's signal to stop, and cruelty to an animal. Mr. LeBeau pled guilty to failure to respond to an officer's signal and was convicted by a jury of aggravated kidnapping, aggravated assault, and cruelty to an animal. Though the State argued at trial that Mr. LeBeau intentionally crashed into Mark's truck in an attempt to kill Stephanie, Mr. LeBeau claimed the collision occurred while he was distracted trying to keep Stephanie from jumping out of the car. The jury acquitted Mr. LeBeau of attempted murder.

¶ 10   At Mr. LeBeau's sentencing hearing, the court determined that the sentencing matrices created by the Utah Sentencing Commission were not applicable to Mr. LeBeau's case because Utah's aggravated kidnapping statute created "a minimum mandatory type sentence." As a result of this determination, the

court began with a presumptive sentence of LWOP and then proceeded to consider whether the balance of aggravating and mitigating factors warranted a reduction in Mr. LeBeau's sentence to one of the statutorily allowed lesser sentences. The court identified two aggravating factors on the record. First, it found that Mr. LeBeau's continued refusal to accept responsibility for his actions was an aggravating factor. Second, the court expressed concern about the serious injuries Stephanie suffered as a result of Mr. LeBeau's conduct.

¶ 11    The court then considered, and rejected, several mitigating factors raised by Mr. LeBeau. First, Mr. LeBeau claimed to have acted under a strong provocation because he believed Stephanie was having an affair with Mark. The court rejected this mitigating factor, stating, "There was no evidence presented that [Stephanie] was having an affair. There was no evidence that she was involved in a sexual relationship." Second, Mr. LeBeau claimed to have a good employment history and strong family ties, both of which indicate rehabilitative potential. The court rejected Mr. LeBeau's claim relating to his employment history, stating, "You were unemployed at the time of this incident. I don't know how you can say that was exceptionally good employment." Similarly, the court refused to consider Mr. LeBeau's family ties as a mitigating factor because Mr. LeBeau had not "seen [his] mother or . . . sister for years at the time they came to testify at trial." Finally, Mr. LeBeau claimed that he had an extended period of arrest-free time prior to this incident. The court rejected this mitigating factor because Mr. LeBeau had an outstanding arrest warrant in Alabama and had admitted to using illegal drugs during that time period. The court found that the fact that Mr. LeBeau had not been arrested for, nor convicted of, an offense for several  years prior to this incident did not necessarily mean that Mr. LeBeau had been law abiding. The court thus refused to consider Mr. LeBeau's relatively minor criminal history a mitigating factor.[2]

---

[2] The district court did consider other mitigating factors not presently before us. The court credited Mr. LeBeau with two mitigating factors: (1) that Mr. LeBeau's imprisonment would work a hardship on Mr. LeBeau's dependents, and (2) that all of Mr. LeBeau's convictions arose from a single criminal episode. The court also rejected Mr. LeBeau's claim that his imprisonment would compromise his ability to make restitution, finding that the likeli-

(continued...)

¶ 12 After weighing the aggravating and mitigating circumstances, the district court found that the aggravating circumstances were "substantial" and the mitigating circumstances "almost non-existent." It then imposed LWOP for the aggravated kidnapping conviction, the most severe sentence allowed under Utah Code section 76-5-302. The court also sentenced Mr. LeBeau to zero to five years for both the aggravated assault and failure-to-respond convictions. Finally, the court imposed a suspended sentence of 180 days for the cruelty-to-an-animal conviction and ordered Mr. LeBeau's lesser sentences to run consecutively with his LWOP sentence.

¶ 13 Mr. LeBeau timely appealed, arguing that the district court abused its discretion in imposing a sentence of LWOP for his aggravated kidnapping conviction. *State v. Lebeau*, 2012 UT App 235, ¶ 16, 286 P.3d 1. Specifically, Mr. LeBeau argued that the district court failed to adequately consider the interests of justice, as required by Utah Code section 76-5-302(4). *See infra* ¶ 24. According to Mr. LeBeau, the district court abused its discretion by (1) failing to consider as a mitigating factor that Mr. LeBeau acted under provocation, (2) failing to give adequate weight to Mr. LeBeau's family support and employment history, (3) failing to credit Mr. LeBeau with his relatively minor prior criminal history, and (4) imposing LWOP without consideration of the proper role of the Board of Pardons and Parole in evaluating the rehabilitative prospects of offenders. *LeBeau*, 2010 UT App 235 ¶¶ 13, 28, 30.

¶ 14 The court of appeals rejected Mr. LeBeau's arguments and upheld his LWOP sentence. *Id.* ¶ 37. The appeals court found that the district court "expressly considered all of [Mr. LeBeau's] mitigating evidence" and that Mr. LeBeau had "demonstrated no more than his disagreement with how the court weighed the mitigating factors." *Id.* ¶ 29. Additionally, the appeals court reasoned that Mr. LeBeau's LWOP sentence was the presumptive sentence prescribed by the Legislature and was, therefore, appropriate. *Id.* ¶¶ 34–36.

¶ 15 We granted certiorari on the question of "[w]hether the court of appeals erred in affirming the district court's imposition of a sentence of life without parole pursuant to Section 76-5-302(3) of

---

[2](...continued)
hood that Mr. LeBeau would ever be able to make restitution was remote.

the Utah Code." We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶ 16 "On certiorari, we review the decision of the court of appeals and not that of the district court." *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699. We review the decision of the court of appeals for correctness, granting "no deference to its conclusions of law." *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650 (citing another case). To determine whether the court of appeals erred in affirming Mr. LeBeau's sentence requires that we consider the standard of review applicable to the court of appeals' review of the sentence. When reviewing a district court's sentencing decision, appellate courts "traditionally afford[] the [district] court wide latitude and discretion." *State v. Moa*, 2012 UT 28, ¶ 34, 282 P.3d 985 (alteration in original) (internal quotation marks omitted). An appellate court will, therefore, only set aside a sentence if the sentence represents an abuse of discretion, if the district court "fails to consider all legally relevant factors, or if the sentence imposed is clearly excessive." *State v. McCovey*, 803 P.2d 1234, 1235 (Utah 1990) (footnote omitted) (internal quotation marks omitted). However, a district court's sentencing determination constitutes an abuse of discretion if such determination is based on an erroneous interpretation of law. *See State v. Barrett*, 2005 UT 88, ¶¶ 14–17, 127 P.3d 682.

## ANALYSIS

### I. UTAH'S AGGRAVATED KIDNAPPING STATUTE

¶ 17 Mr. LeBeau was convicted of aggravated kidnapping pursuant to section 76-5-302 of the Utah Code. Section 76-5-302 defines aggravated kidnapping as a first degree felony and establishes a complex sentencing scheme that contemplates a range of possible sentences based on the seriousness of the offender's conduct. Mr. LeBeau was sentenced pursuant to subsection (3)(b), which establishes that aggravated kidnapping resulting in "serious bodily injury to another" is punishable by LWOP, "except as provided in Subsection . . . (4)." UTAH CODE 76-5-302(3)(b) (2008). Subsection (4), in turn, allows a sentencing court to impose an indefinite term of six, ten, or fifteen years to life if it finds that doing so would be "in the interests of justice."[3] *Id.* § 76-5-302(4).

---

[3] The relevant subsections of Utah's aggravated kidnapping

(continued...)

¶ 18    The heart of Mr. LeBeau's challenge concerns the proper interpretation of subsections (3)(b) and (4). Mr. LeBeau argues that the district court failed to adequately consider the "interests of justice" when sentencing him to LWOP. Though the court did consider whether Mr. LeBeau's sentence should be reduced, it did so by starting with a presumptive sentence of LWOP and then considering "the aggravating and mitigating circumstances" of the crime to determine if Mr. LeBeau's sentence should be reduced to one of the lesser terms allowed for in subsection (4). Though the district court did not expressly state its reasoning, it appears to have interpreted the Legislature's use of the phrase "interests of justice" as equivalent to the "aggravating and mitigating circumstances"

---

[3](...continued)
statute provide:

> (3) Aggravated kidnapping is a first degree felony punishable by a term of imprisonment of:
>
>> (a) except as provided in Subsection (3)(b), (3)(c), or (4), not less than 15 years and which may be for life;
>> (b) except as provided in Subsection (3)(c) or (4), life without parole, if the trier of fact finds that during the course of the commission of the aggravated kidnapping the defendant caused serious bodily injury to another; or
>> (c) life without parole, if the trier of fact finds that at the time of the commission of the aggravated kidnapping, the defendant was previously convicted of a grievous sexual offense.
>
> (4) If, when imposing a sentence under Subsection (3)(a) or (b), a court finds that a lesser term than the term described in Subsection (3)(a) or (b) is in the interests of justice and states the reasons for this finding on the record, the court may impose a term of imprisonment of not less than:
>
>> (a) for purposes of Subsection (3)(b), 15 years and which may be for life; or
>> (b) for purposes of Subsection (3)(a) or (b):
>>
>>> (i) 10 years and which may be for life; or
>>> (ii) six years and which may be for life.

UTAH CODE § 76-5-302(3)–(4).

recognized by the Utah Sentencing Commission as part of its sentencing guidelines. Mr. LeBeau asserts that this was in error because the Legislature's use of the phrase "interests of justice" requires consideration of factors beyond the aggravating and mitigating circumstances of his particular crime. Specifically, Mr. LeBeau argues that the district court was required to consider (1) the severity of an LWOP sentence, (2) whether a sentence of LWOP was proportionate to the seriousness of Mr. LeBeau's crime, and (3) Mr. LeBeau's rehabilitative potential. Further, Mr. LeBeau argues that the district court erred when it rejected several of Mr. LeBeau's proposed mitigating factors by employing incorrect legal standards in its analysis.

¶ 19    Our task of reviewing Mr. LeBeau's sentence requires that we interpret section 76-5-302 of the Utah Code, which calls for the imposition of a sentence of LWOP unless the interests of justice dictate a lesser sentence. We note, first, that any error on the part of the district court in its interpretation of subsection (4)'s interests-of-justice language would be harmless if the district court were free to sentence Mr. LeBeau to LWOP without considering the interests of justice in the first instance. Thus, the threshold question is whether the district court was required to engage in an interests-of-justice analysis prior to sentencing Mr. LeBeau to LWOP under subsection (3)(b). Because we conclude that the court was so required, we then turn our attention to the proper meaning of "interests of justice" as used in subsection (4). Finally, we consider Mr. LeBeau's claim that the district court erred when it rejected several of his proposed mitigating factors.

## II. THE DISTRICT COURT WAS REQUIRED TO CONDUCT AN INTERESTS-OF-JUSTICE ANALYSIS PRIOR TO SENTENCING MR. LEBEAU TO LWOP

¶ 20    As with any question of statutory interpretation, our primary goal is to effectuate the intent of the Legislature. *State v. Watkins*, 2013 UT 28, ¶ 18, 309 P.3d 209. The best evidence of the Legislature's intent is the statute's plain language. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863. "We presume that the [L]egislature used each word advisedly and give effect to each term according to its ordinary and accepted meaning." *Taylor ex rel. C.T. v. Johnson*, 1999 UT 35, ¶ 9, 977 P.2d 479 (internal quotation marks omitted). Further, "we interpret[] statutes to give meaning to all parts, and avoid[] rendering portions of the statute superfluous." *Watkins*, 2013 UT 28, ¶ 23 (alterations in original) (internal quotation marks omitted). To do so, "we read the plain

language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682 (internal quotation mark omitted).

¶ 21 Subsection (3)(b) of Utah's aggravated kidnapping statute directs sentencing courts to impose a sentence of LWOP, "except as provided in Subsection . . . (4)." UTAH CODE § 76-5-302(3)(b) (2008). Subsection (4) allows the court to impose a lesser indefinite term if it finds that doing so would be "in the interests of justice." *Id.* § 76-5-302(4). We read subsections (3) and (4) together as requiring an interests-of-justice analysis. First, the plain language of subsection (3)(b) directs the court to impose a sentence of LWOP "except as provided in Subsection . . . (4)." *Id.* § 76-5-302(3)(b). Here, the word "except" is followed by a phrase that describes the particular manner or circumstance—as provided in subsection (4)—in which a sentence of LWOP is not applicable. As such, subsection (3)(b) is best read as establishing a presumptive sentence of LWOP while also delineating the particular circumstance in which LWOP would be inappropriate. It follows that, in order to determine whether LWOP would be inappropriate, a court must engage in the interests-of-justice analysis laid out in subsection (4). If courts were free to impose LWOP without first considering the interests of justice, the exception provided by the Legislature would be rendered meaningless. Thus, we read subsections (3)(b) and (4) together as requiring that sentencing courts consider the interests of justice to determine whether a lesser sentence is appropriate.

¶ 22 Reading Utah's aggravated kidnapping statute as a whole further supports this conclusion. The statute distinguishes three types of aggravated kidnapping: (1) aggravated kidnapping, (2) aggravated kidnapping resulting in serious bodily injury, and (3) aggravated kidnapping committed by a defendant who has previously been convicted of a "grievous sexual offense." *Id.* § 76-5-302(3). It then establishes different sentences for each. *Id.* For example, a defendant convicted of aggravated kidnapping may be sentenced to a sentence of fifteen years to life. *Id.* § 76-5-302(3)(a). In contrast, defendants who have been previously convicted of a grievous sexual offense or who cause substantial bodily injury in the course of an aggravated kidnapping face a maximum sentence of LWOP. *Id.* § 76-5-302(3)(b)–(c). This reflects the legislative judgment that more serious offenses are deserving of harsher punishment.

¶ 23 Further bolstering our conclusion that the Legislature intended to differentiate between different types of aggravated

kidnapping, the Legislature directed that the maximum sentences for aggravated kidnapping and aggravated kidnapping resulting in serious bodily injury should be imposed "except as provided in Subsection . . . (4)," which triggers the interests-of-justice analysis. *See id.* § 76-5-302(3)(a)–(b). But the Legislature specifically directed that defendants who have been previously convicted of grievous sexual offenses may not be sentenced to one of the lesser terms contained in subsection (4). *Id.* § 76-5-302(5). Thus, a sentencing court has no option but to impose a sentence of LWOP for these offenders. In contrast, defendants who cause substantial bodily injury are eligible for a lesser sentence if the sentencing court determines that such a reduction is in the interests of justice. Thus, the Legislature provided for the possibility of a reduced sentence for defendants sentenced under either subsection (3)(a) or (3)(b), but not for those sentenced under subsection (3)(c). This tri-level distinction makes clear the Legislature's judgment that not all aggravated kidnappings are the same and evidences the Legislature's intent to punish more "serious" kidnappings with harsher sentences.

¶ 24    Were we to conclude that sentencing courts could impose the statutory presumptive sentence under subsections (3)(a) and (3)(b) without first considering the interests of justice, it would undermine the distinctions between the different types of aggravated kidnapping drawn by the Legislature. Though the language of subsection (4) is permissive, the statutory scheme makes clear that the Legislature did not intend to give sentencing courts a license to ignore this subsection altogether. Rather, reading subsections (3) and (4) together, we conclude that the Legislature intended sentencing courts to consider the interests of justice when sentencing defendants under subsections (3)(a) or (3)(b), but not under subsection (3)(c).

## III.  THE DISTRICT COURT FAILED TO PROPERLY CONSIDER THE INTERESTS OF JUSTICE AS REQUIRED BY UTAH CODE SECTION 76-5-302(4)

¶ 25    Having determined that the district court was required to engage in an interests-of-justice analysis when sentencing Mr. LeBeau, we turn our attention to what is required for such an analysis. At sentencing, the court did consider whether a lesser indeterminate sentence was appropriate for Mr. LeBeau. In doing so, the court considered Mr. LeBeau's crime in light of the list of aggravating and mitigating circumstances compiled by the Utah Sentencing Commission in its sentencing guidelines. Though the district court did not articulate its reasoning on the record, it appears

that the court equated the weighing of these aggravating and mitigating circumstances with an interests-of-justice analysis. Mr. LeBeau argues that this was in error and that an interests-of-justice analysis requires the court to consider factors other than the aggravating and mitigating circumstances surrounding a particular defendant and crime.[4] We have yet to consider the import of the Legislature's use of the phrase "interests of justice" in this context. Therefore, our task is to determine what the Legislature intended when it instructed courts to consider whether the interests of justice would be served by imposing a lesser sentence.

¶ 26   We begin, as always, with the statutory text. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863. We presume that the Legislature chose its words carefully, using each term advisedly. *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682. Absent some indication of contrary legislative intent, we give effect to each term according to its ordinary meaning. *Taylor ex rel. C.T. v. Johnson*, 1999 UT 35, ¶ 9, 997 P.2d 479. If the statutory language remains ambiguous—meaning the statute is susceptible to two or more reasonable interpretations—we may resort to other indications of legislative intent, including legislative history and policy considerations. *State v. Watkins*, 2013 UT 28, ¶ 24, 309 P.3d 209.

¶ 27   The Legislature did not provide a statutory definition of "in the interests of justice." Accordingly, we look to other sources to derive the meaning of the phrase. *See State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719 (approving the use of dictionaries to ascertain the "range of possible meanings that a statutory term may bear" (internal quotation mark omitted)). Generally, the phrase "in the interests of" connotes being "to the advantage or advancement of" something. RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 993 (2d ed. 1987); *see also* WEBSTER'S NEW COLLEGE DICTIONARY 744 (2007) (defining "in the interests of" as "for the sake of"). So, something "in the interests of justice" will act to advance or promote justice. But "justice" is an abstract notion that incorporates a variety

---

[4] Mr. LeBeau argues that an interests-of-justice analysis requires courts to consider the totality of the circumstances. Though we agree that the Legislature's use of the phrase "interests of justice" requires consideration of factors beyond the aggravating and mitigating circumstances of the crime, we conclude that the statute requires a more focused analysis than Mr. LeBeau's proposed totality-of-the-circumstances test.

of meanings. As used in this context, "justice" imparts notions of impartiality or fairness, including the receipt of a "reward or penalty as deserved." WEBSTER'S NEW COLLEGE DICTIONARY 777. A sentence "in the interests of justice" will therefore work to promote impartiality or fairness and ensure the defendant receives the penalty he deserves. While these definitions inform our understanding of the Legislature's intent, they do not adequately direct courts as to what they should actually consider when confronted with a particular case. Accordingly, we must look for further guidance.

¶ 28    The phrase "in the interests of justice" appears in many other parts of the Utah Code, but is never specifically defined. *See, e.g.,* UTAH CODE § 75-7-204(2)(b) (2013) (allowing Utah courts to entertain proceedings involving foreign trusts if "the interests of justice would be seriously impaired" by dismissal); *id.* § 78B-1-136 (establishing a witness's right "to be detained only so long as the interests of justice require"); *id.* § 77-8a-1(2)(d) (directing Utah courts to jointly try co-defendants unless the court finds that separate trials would be in "the interests of justice"); UTAH R. EVID. 807(a)(4) (allowing courts to admit otherwise inadmissible hearsay statements if doing so is in "the interests of justice"); UTAH R. APP. P. 5(f) (directing that an appeal from an interlocutory order should only be granted if in the "interests of justice"). What quickly becomes clear is that the Legislature cannot have meant to use the phrase "in the interests of justice" in the same manner in all these different contexts.

¶ 29    The Legislature added the interests-of-justice language to Utah's aggravated kidnapping statute in 2007 as part of a sweeping revision of the penalties associated with sexual offenses and kidnapping. *See* 2007 Utah Laws 2060–73. The Legislature crafted a sentencing scheme substantially similar to that found in the aggravated kidnapping statute in at least eight other criminal statutes. *See* UTAH CODE §§ 76-4-102 (attempt)*,* -204 (criminal solicitation); *id.* §§ 76-5-301.1 (child kidnapping), -402 (rape), -402.1 (rape of a child), -402.2 (object rape), -404 (forcible sexual abuse), -405 (aggravated sexual assault). Each of these statutes, except solicitation and attempt, governs crimes involving kidnapping and sexual assault. And in each case, the Legislature created a presumptive sentence and instructed sentencing courts to consider whether the interests of justice warranted a lesser sentence. Our task, then, is to determine what the phrase means in the context of

the sentencing scheme crafted by the Legislature in these related statutes.

*A. Section 76-5-302(4)'s Interests-of-Justice Analysis Is not Equivalent to Weighing the Aggravating and Mitigating Circumstances*

¶ 30    As an initial matter, we conclude that the Legislature did not intend the phrase "interests of justice" as a mere substitute for the weighing of aggravating and mitigating circumstances recognized by the Sentencing Commission.[5] First, the plain language of the statute does not support such an interpretation. The Legislature instructed courts to consider the "interests of justice," not just to weigh the "aggravating and mitigating circumstances." Though the two concepts are related, they are not equivalent.

¶ 31    The Utah Sentencing Commission is empowered to create sentencing guidelines designed to "increase equity in criminal sentencing." UTAH CODE § 63M-7-404(3). To that end, the Sentencing Commission creates sentencing guidelines that include a nonexhaustive list of aggravating and mitigating circumstances that are used by courts in their sentencing decisions. *See* UTAH ADULT SENTENCING AND RELEASE GUIDELINES 13 (2009). The sentencing guidelines instruct courts to consider all of the aggravating and mitigating circumstances of a particular crime holistically when sentencing offenders. *Id.* at 12. Had the Legislature intended courts to consider only the aggravating and mitigating circumstances recognized by the Sentencing Commission when sentencing defendants under Utah's aggravated kidnapping statute, it had the means and knowledge to so instruct. Instead, the Legislature directed courts to consider "the interests of justice."

¶ 32    More tellingly, prior to 2007, section 76-3-201(7)(e) of the Utah Code did instruct the courts to "consider sentencing guidelines regarding aggravating and mitigating circumstances promulgated by the Sentencing Commission" when "determining a just sentence." Defendants convicted of aggravated kidnapping were sentenced to an indefinite term of six, ten, or fifteen years to life. UTAH CODE § 76-5-302(3) (2006). The court was required to impose the middle-severity term of ten years to life, "unless there [were] circumstances

---

[5] As discussed below, the aggravating and mitigating circumstances relating to a particular crime are certainly relevant to the court's interests-of-justice analysis. *Infra* ¶¶ 42, 46. But aggravating and mitigating circumstances are simply one facet of the proper analysis.

in aggravation or mitigation of the crime." *Id.* § 76-3-201(7)(a). Section 76-3-201(7)(e) then directed the court to consider the aggravating and mitigating circumstances recognized by the Utah Sentencing Commission. However, this sentencing scheme was removed from the Utah Code in the same revision that created the interests-of-justice sentencing scheme in the related kidnapping and sexual assault statutes.[6] *Compare* 2007 Utah Laws 2064, *with id.* at 2069. In light of the Legislature's decision in 2007 to remove references to the Sentencing Commission's list of aggravating and mitigating factors, we do not read section 76-5-302(4)'s interests-of-justice language as equivalent to the previous aggravating-and-mitigating-circumstances language.

¶ 33    In Mr. LeBeau's case, the district court looked to the list of aggravating and mitigating circumstances contained in the sentencing guidelines and no further. Because the Legislature replaced its previous aggravating-and-mitigating-circumstances instruction with the new mandate to consider the interests of justice, we conclude that the district court's analysis was in error. We now turn our attention to what a proper interests-of-justice analysis requires.

### B. An Interests-of-Justice Analysis Requires Consideration of Proportionality and the Defendant's Rehabilitative Potential

¶ 34    Though the Legislature did not specifically define "interests of justice" in the aggravated kidnapping statute, it has provided guidance elsewhere in the Utah Code. Section 76-1-106 of the Utah Code directs that Utah's criminal code "shall be construed according to the fair import of [its] terms *to promote justice* and to effect the objects of the law and general purposes of [s]ection 76-1-104." (Emphasis added). Section 76-1-104 sets forth four general goals of Utah's criminal code:

> (1) Forbid and prevent the commission of offenses.

> (2) Define adequately the conduct and mental state which constitutes each offense and safeguard conduct that is without fault from condemnation as criminal.

---

[6] Utah's capital sentencing scheme continues to direct that juries must consider the "totality of the aggravating and mitigating circumstances" when deciding whether to impose the death penalty. UTAH CODE § 76-3-207(5)(b). Section 76-3-207(4) presents a nonexhaustive list of factors that may be considered.

(3) *Prescribe penalties* which are *proportionate to the seriousness of offenses* and which permit *recognition* [*of*] *differences in rehabilitation possibilities* among individual offenders.

(4) Prevent arbitrary or oppressive treatment of persons accused or convicted of offenses.

(Emphasis added.)

¶ 35   The goals enumerated in section 76-1-104 relate to different aspects of the criminal code. For example, subsection (2) relates to the public definition of offenses. This necessarily incorporates ideas of fair notice and due process because a just criminal code must adequately inform those subject to it of the behaviors that will expose them to criminal liability. Subsection (4) addresses the treatment of individuals once they are brought into the criminal justice system and recognizes the importance of fair treatment of those individuals.

¶ 36 But it is subsection (3) that relates most closely to sentencing. Subsection (3) articulates the legislative goal that sentencing be proportionate to the seriousness of the defendant's conduct and recognizes that individual offenders have different potential for rehabilitation. Thus, reading sections 76-1-104 and 76-1-106 together, we must construe our criminal code in ways that "promote justice," including principles of proportionality and a recognition of the rehabilitative potential of individual defendants.

¶ 37   Keeping these basic principles in mind, we conclude that the Legislature's use of the phrase "interests of justice" necessarily requires the court to consider the proportionality of the defendant's sentence in relation to the severity of his offense. Additionally, it requires that sentencing judges appropriately weigh a defendant's potential for rehabilitation.

1. A Proportionality Analysis Requires the Court to Consider the Seriousness of the Defendant's Conduct When Compared to the Severity of His Sentence and the Sentences Imposed for Different Offenses

¶ 38   "The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm*, 463 U.S. 277, 284 (1983). For example, the United States Supreme Court has long recognized the existence of a proportionality principle in its jurisprudence related to the Eighth Amendment's Cruel and Unusual Punishments Clause.

U.S. CONST. amend. VIII, *see, e.g., Weems v. United States*, 217 U.S. 349 (1910) (recognizing that the Eighth Amendment prohibits grossly disproportionate sentences). Though the Court has struggled to effectively articulate the precise contours of the Eighth Amendment's proportionality principle, *see, e.g., Harmelin v. Michigan*, 501 U.S. 957 (1991), it has articulated a set of guiding principles that can assist in our analysis.

¶ 39 It is important to note, first, that the Supreme Court's proportionality jurisprudence arose in a very different context than that with which we are now confronted. Typically, the Court was confronted with a challenge to the constitutionality of a legislatively enacted sentencing statute. *See, e.g., Weems*, 217 U.S. at 359; *Rummel v. Estelle*, 445 U.S. 263, 265 (1980) (upholding a mandatory life sentence with the possibility of parole under a recidivist statute for a defendant's third nonviolent felony); *Graham v. Florida*, 560 U.S. 48, 75 (2010) (rejecting a sentence of LWOP for juveniles convicted of nonhomicide crimes). As it has addressed these constitutional challenges, the Court has struggled to balance deference to legislative judgment as to the appropriate sentence for a particular crime with the long-standing precept that sentences "should be graduated and proportioned to [the] offense." *Weems*, 217 U.S. at 367; *see also Harmelin*, 501 U.S. at 998–1001 (attempting to reconcile the need for judicial deference to legislatively enacted sentences and the need for proportionality). But the case before us presents a very different question. We are not being asked to overturn a sentence imposed by the Legislature on the grounds that it is constitutionally disproportionate. Instead, our task is to ensure that courts properly comply with the Legislature's instruction to undertake a proportionality analysis when sentencing defendants pursuant to section 76-5-302 of the Utah Code. Accordingly, while we take guidance from the Supreme Court's proportionality jurisprudence, we do so with the understanding that our analysis is necessarily different.

¶ 40 In *Solem*, the Supreme Court considered the constitutionality of a South Dakota recidivism statute that imposed a sentence of LWOP on a defendant who had written a "no account" check for $100, a class 5 felony under South Dakota law. 463 U.S. at 280–81 & n.5. Because the defendant had previously been convicted of six other nonviolent felonies, his sentence was enhanced to that of a class 1 felony, LWOP. *Id.* at 281. The defendant brought a proportionality challenge under the Eighth Amendment, arguing

that LWOP was grossly disproportionate to his crime of passing a $100 bad check. *Id.* at 283.

¶ 41 The Court enumerated three objective factors designed to guide its proportionality analysis: (1) the seriousness of the defendant's conduct in relation to the severity of the sentence imposed, (2) the severity of the sentence imposed in light of sentences imposed for other crimes in the same jurisdiction, and (3) the severity of the sentence imposed in relation to sentences imposed for the commission of the same crime in other jurisdictions. *Id.* at 290–92. In *State v. Gardner*, this court considered a constitutional challenge to a sentence of death for a defendant convicted of aggravated assault while in prison. 947 P.2d 630 (Utah 1997). In a thorough discussion of Utah's Cruel and Unusual Punishment Clause, Justice Durham articulated a test for proportionality that is substantially similar to that which was established in *Solem*. *Id.* at 639–40 (Durham, J., plurality opinion). We find this reasoning persuasive and adopt the first two of these factors for the purpose of section 76-5-302(4)'s interests-of-justice analysis. But in the context before us, we see no indication that the Legislature intended sentencing courts to consider the sentences imposed by the legislatures of other jurisdictions. Accordingly, we conclude that the third *Solem* factor is inappropriate for an interests-of-justice analysis under section 76-5-302 of the Utah Code.

a. The seriousness of the defendant's conduct in relation to the severity of his sentence

¶ 42 First, sentencing courts should consider "the gravity of the offense and the harshness of the penalty." *Solem*, 463 U.S. at 290–91. This factor necessarily includes an examination of the nature and circumstances of the defendant's crime. Though we decline to articulate an exhaustive list of circumstances a court should consider, we note that the list of aggravating and mitigating circumstances created by the Utah Sentencing Commission provides a good starting point. Many of the Sentencing Commission's guidelines already take into account factors relevant to the gravity of the defendant's conduct. However, we emphasize that courts should not limit their inquiry merely to those factors recognized by the Sentencing Commission. Rather, courts should consider all relevant facts raised by the parties about the defendant's crime in relation to the harshness of the penalty.

¶ 43 In general, nonviolent crimes should be viewed as less serious than violent crimes. *Id.* at 292-93. The Legislature made a

similar determination when it mandated enhanced penalties for repeat violent offenders. *See* UTAH CODE § 76-3-203.5. Similarly, a violent offense committed in the presence of a child constitutes an aggravating factor during sentencing. *Id.* § 76-3-203.9. The considered judgment of the Legislature indicates that such violent offenses are to be considered as more serious than nonviolent ones.

¶ 44 The court may also consider the "absolute magnitude of the crime." *Solem*, 463 U.S. at 293. A crime that results in the loss of more valuable property may be more serious than stealing a few hundred dollars worth of retail goods. For example, in Utah, theft is usually a class B misdemeanor if the value of the property stolen is less than $500. UTAH CODE § 76-6-412(1)(d). In contrast, theft of property valued above $5,000 is a second degree felony, reflecting the Legislature's judgment that theft involving more valuable property is a more serious offense. *See id.* § 76-6-412(1)(a).

¶ 45 Another important consideration is the culpability of the offender. We generally agree with the notion that negligent conduct is less serious than intentional conduct. *Solem*, 463 U.S. at 293; *see also* UTAH CODE § 76-2-101(1) (establishing that a defendant must act with at least criminal negligence to be guilty of an offense). Moreover, a defendant's motivation for committing his crime is highly relevant. For example, a homicide committed for monetary gain should generally be viewed as more serious than manslaughter that results from a defendant's reckless actions. *Compare* UTAH CODE § 76-5-202(1)(g) (establishing a homicide committed for pecuniary gain as aggravated murder), *with id.* § 76-5-205 (defining manslaughter). *See also id.* § 76-3-203.3(2)(a) (establishing increased penalties for hate crimes committed "with the intent to intimidate or terrorize another person").

¶ 46 We emphasize that a court's consideration of this first factor should be guided by its objective assessment of the nature and circumstances of the defendant's crime in relation to the harshness of the penalty. The above discussion is not intended to provide an exhaustive list of factors because sentencing remains a highly fact-dependent endeavor. And the Sentencing Commission's list of aggravating and mitigating circumstances remain relevant for this factor. On remand, the sentencing court should consider the seriousness of Mr. LeBeau's conduct in light of the severe nature of a sentence of LWOP when determining whether the interests of justice warrant the imposition of one of subsection (4)'s lesser sentences.

b. Sentences imposed for other crimes in Utah

¶ 47    Second, sentencing courts should compare the sentence being imposed to the sentences imposed for other crimes in Utah. A key proposition underlying the proportionality principle is fairness. Defendants who commit more serious offenses should be punished more severely than those who commit less serious crimes. As part of a proportionality analysis, courts should consider the sentences imposed for more and less serious crimes in order to ensure that a particular defendant's sentence is not arbitrary.

¶ 48    For example, in Utah, a person who commits intentional murder is guilty of a first degree felony punishable by an indeterminate sentence of fifteen years to life in prison. UTAH CODE § 76-5-203(3). In order for a defendant who commits a murder to be eligible for a sentence of LWOP, he must be convicted of aggravated murder as defined by section 76-5-202 of the Utah Code. *Id.* § 76-3-207.7. Aggravated murder requires that the defendant commit the crime under circumstances that would justify such a severe sentence. *Id.* § 76-5-202(1). For example, a murder accompanied by the sexual abuse of a child or committed by the use of a weapon of mass destruction would qualify for aggravated murder. *Id.* § 76-5-202(1)(n)(ii), (2)(a). But absent the aggravating factors found in section 76-5-202, a defendant who commits first degree murder can expect a maximum sentence of life with the possibility of parole.

¶ 49    Other crimes for which the Legislature has established LWOP as a possible sentence include a variety of sexual offenses, but only if the defendant is a repeat offender. For example, aggravated sexual assault, rape, and sodomy each carry a penalty of LWOP if the defendant was previously convicted of a grievous sexual offense. *Id.* §§ 76-5-405(2), -402(3)(c), -403(4)(c). In the case of a child victim, the Legislature allows a sentence of LWOP for first-time offenders if the defendant causes serious bodily injury. *Id.* §§ 76-5-404.1(5)(b), -402.1(2)(b)(i), -403.1(2)(b)(i). When the Legislature established this sentencing scheme for sexual offenses, it signaled its judgment that sexual crimes, which intrude on the fundamental bodily integrity of the victim like no others short of murder, are serious enough to warrant a sentence of LWOP.

¶ 50    In contrast, Mr. LeBeau was sentenced to LWOP for an aggravated kidnapping in which no one was killed and which was unaccompanied by the type of bodily and dignitary harm associated with sexual assaults. We agree that murder is generally a more serious crime than aggravated kidnapping. And sexual crimes,

particularly those involving children, represent an especially heinous form of bodily insult. Of course, the Legislature is empowered to mandate a sentence of LWOP for aggravated kidnapping. *Gardner*, 947 P.2d at 639 (plurality opinion) ("What constitutes an adequate penalty is a matter of legislative judgment and discretion . . . ." (internal quotation marks omitted)). But proper deference to the Legislature in this case includes deference to the *entire* sentencing scheme, including the Legislature's instruction that courts should consider the interests of justice. Thus, the proportionality principle incorporated into the Legislature's interests-of-justice requirement demands consideration of the penalties established by the Legislature for other crimes. On remand, the sentencing court should look to the sentences prescribed by our Legislature for other crimes to gain insight into whether the interests of justice favor a lesser sentence for Mr. LeBeau.

¶ 51 Having provided some guidance as to the proper proportionality analysis for the court on remand, we turn our attention to the second interests-of-justice factor in the Utah Code, the defendant's capacity for rehabilitation.

2. Proper Consideration of the Interests of Justice Includes Deference to the Role of the Board of Pardons and Parole

¶ 52 As noted above, one of the goals of the Utah Criminal Code is to promote justice through the imposition of penalties "which permit recognition [of] differences in rehabilitation possibilities among individual offenders." UTAH CODE § 76-1-104(3). The Board of Pardons and Parole (Board) has the power to "grant parole . . . as provided by statute." UTAH CONST. art. VII, § 12(2)(a). We have previously recognized the important role the Board plays in Utah's indeterminate sentencing scheme. *State v. Smith*, 909 P.2d 236, 244 (Utah 1995); *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 907 (Utah 1993). In *Smith*, we rejected the district court's imposition of four consecutive sentences totaling a minimum mandatory sentence of sixty years. 909 P.2d at 244-45. Section 76-3-401(2) of the Utah Code directs district courts to consider the "rehabilitative needs of the defendant" when determining whether to impose consecutive or concurrent sentences. We held that the court's imposition of four consecutive sentences was an abuse of discretion, in part because the "Board is in a far better position than a court to monitor a defendant's subsequent behavior and possible progress toward rehabilitation while in prison and to adjust the maximum sentence accordingly." *Id.* at 244.

¶ 53   An important part of our reasoning in *Smith* centered on the Legislature's decision to grant the Board broad authority to determine what a particular defendant's maximum sentence should be. *Id.* The court of appeals concluded that the Legislature's decision to make LWOP the presumptive sentence for aggravated kidnapping "essentially countermanded, for this crime, Utah's long-standing sentencing philosophy of indeterminate sentencing." *State v. Lebeau*, 2012 UT App 235, ¶ 36, 286 P.3d 1. Were LWOP the only sentencing option for Mr. LeBeau, we might agree. But the Legislature instructed courts to consider the interests of justice when imposing a sentence under the aggravated kidnapping statute, expressly acknowledging that an indeterminate sentence is appropriate in some cases. And as we have already noted, the interests-of-justice analysis requires consideration of the defendant's potential for rehabilitation.

¶ 54   Sentencing courts must consider all of the factors relevant to a defendant's rehabilitative potential. We have previously indicated that a defendant's age at the time of the commission of the crime is relevant. *State v. Strunk*, 846 P.2d 1297, 1300-02 (Utah 1993). Other relevant factors include the extent to which a defendant's crime was tied to alcohol or drug addiction and the defendant's prospects for treatment. The extent to which a defendant's criminal history evidences continual violence is also relevant to his rehabilitative potential. Finally, the Sentencing Commission's guidelines, several of which relate to a defendant's capacity for rehabilitation, may prove helpful to sentencing courts in their analysis. We emphasize, however, that sentencing courts should consider all relevant factors when evaluating the defendant's rehabilitative potential.

¶ 55   In sum, sentencing courts should consider the proportionality of a sentence to the seriousness of the defendant's conduct and the defendant's potential for rehabilitation when determining whether the interests of justice support a lesser sentence. The sentencing court in this case failed to properly consider the interests of justice when sentencing Mr. LeBeau. We therefore reverse and remand for a new sentencing. Because the sentencing court on remand will be required to consider the aggravating and mitigating circumstances as part of its interests-of-justice analysis, and because Mr. LeBeau argued that the sentencing court previously erred in evaluating several of his proposed mitigating factors, we take this opportunity to provide guidance to the sentencing court on remand.

## IV. THE DISTRICT COURT IMPROPERLY EVALUATED MR. LEBEAU'S PROPOSED MITIGATING FACTORS

¶ 56  Mr. LeBeau argues that the district court erroneously rejected several of his proposed mitigating factors, including (1) his claim that he acted under strong provocation, (2) his relatively minor criminal history, (3) his employment history, and (4) his family ties. Because the district court will be required to assess these factors in its interests-of-justice analysis on remand, we take this opportunity to provide guidance as to the appropriate legal standards.

*A.  The District Court Applied the Incorrect Legal Standard when It Rejected Mr. LeBeau's Claim that He Acted Under Provocation*

¶ 57  At sentencing, Mr. LeBeau argued that he acted under provocation the night he kidnaped Stephanie because he was upset at the thought that she was having an affair with another man.  The district court rejected this claimed mitigating circumstance, stating, "There was no evidence presented that [Stephanie] was having an affair.  There was no evidence that she was involved in a sexual relationship.  You came to that conclusion, but I found no basis for that."  Mr. LeBeau argues that he was not required to prove that Stephanie was actually engaged in a sexual relationship with Mark. Rather, it was enough that Mr. LeBeau believed Stephanie was having an affair and reacted in the heat of the moment because of that belief.

¶ 58  We agree with Mr. LeBeau that the district court applied the incorrect legal standard in its analysis of this mitigating factor. Though we have never expressly addressed the question in this context, we recently reiterated the proper legal standard to be applied in the context of the affirmative defense of extreme emotional disturbance.  *See Ross v. State*, 2012 UT 93, ¶¶ 27–33, 293 P.3d 345.  In *Ross*, we held that "the fact finder must determine whether (1) subjectively, the defendant committed the [crime] while under the influence of extreme emotional distress, and (2) objectively, a reasonable person would have experienced an extreme emotional reaction and loss of self-control under the circumstances." *Id.* ¶ 28.  By analogy, determining whether Mr. LeBeau acted under strong provocation the night he kidnaped Stephanie requires the court to undertake a similar analysis, taking into account both Mr. LeBeau's subjective experience and the objective reasonableness of that experience.

¶ 59  In this case, the district court rejected Mr. LeBeau's claim of provocation on the basis that Mr. LeBeau had not established that

Stephanie was, in fact, having an affair. This had the effect of requiring Mr. LeBeau to overcome a much greater hurdle than our precedent requires. Mr. LeBeau was not required to demonstrate that Stephanie and Mark were actually having an affair, only that Mr. LeBeau reasonably believed they were. But the district court wholly disregarded Mr. LeBeau's subjective experience in its analysis. There is evidence in the record that Mr. LeBeau's actions on the night in question were driven by his genuine belief that Stephanie was having an affair with Mark. Shortly before the fateful night, Stephanie had moved out of the couple's shared bedroom. Stephanie testified that she spent the evening of February 23, 2009, with Mark and that Mr. LeBeau was upset when she returned home. Stephanie had refused to answer her cell phone while she was with Mark and Mr. LeBeau repeatedly asked Stephanie where she had been and with whom. After Stephanie told Mr. LeBeau that she had been with Mark, the situation escalated. Stephanie testified that Mr. LeBeau accused her of breaking his heart before forcing her into the car and driving toward Mark's house.

¶ 60 Stephanie's testimony paints the picture of a man acting, at least in part, out of jealousy and corroborates Mr. LeBeau's claim that he reacted emotionally on the night in question. Though this does not excuse Mr. LeBeau's deplorable actions, his subjective emotional state was relevant to the mitigating factor of provocation. On remand, the sentencing court should examine Mr. LeBeau's actions in light of the proper legal standard to determine whether Mr. LeBeau acted under provocation the night he kidnaped Stephanie.

### B. The District Court Improperly Weighed Mr. LeBeau's Criminal History

¶ 61 Mr. LeBeau argues that the district court improperly rejected his relatively minor criminal history as a mitigating factor. We agree. Mr. LeBeau's criminal history includes a single conviction from 1989 for first degree robbery, when Mr. LeBeau was a juvenile, and a conviction for possession of marijuana in 1993. The presentence report also showed that Mr. LeBeau had been arrest free since 2001.

¶ 62 At sentencing, the district court rejected Mr. LeBeau's criminal history as a mitigating factor because Mr. LeBeau had an outstanding warrant for his arrest in Alabama and was living under an assumed name at the time he kidnaped Stephanie. The court also noted Mr. LeBeau's admitted drug use as a reason to find Mr.

LeBeau's criminal history nonmitigating. Though Mr. LeBeau's history indicates that he was no angel, neither was he the type of hardened criminal we normally associate with a sentence of LWOP.

¶ 63    Because the Legislature established a separate sentencing scheme for aggravated kidnapping, we agree with the district court judge that the sentencing guidelines established by the Utah Sentencing Commission are not strictly applicable to Mr. LeBeau's case. However, the sentencing guidelines were not rendered totally irrelevant. In particular, the criminal history matrices still inform the inquiry into the seriousness of the defendant's criminal history. The Sentencing Commission is charged with developing sentencing guidelines designed to "increase equity in criminal sentencing." UTAH CODE § 63M-7-404(3) (2013). We do not conclude that the Legislature intended for sentencing courts to completely ignore the wisdom of the Sentencing Commission guidelines when it established the sentencing scheme for section 76-5-302 of the Utah Code, particularly in light of the Legislature's instruction to consider the interests of justice.

¶ 64    As Mr. LeBeau notes, his criminal history scores relatively low on the general offender matrix.[7] His score corresponds to a recommended sentence of eight years for a first degree felony involving injury to a person. According to the matrix, an offender with Mr. LeBeau's criminal history score would receive a recommended sentence of twenty years for first degree murder. Though the sentencing matrices do not carry the same weight in light of the sentencing scheme set out by the Legislature in the aggravated kidnapping statute, they still provide insight into the relative seriousness of a defendant's criminal history and provide an important check against arbitrary sentencing. Thus, the district court erred in completely disregarding the sentencing matrices when considering whether Mr. LeBeau's criminal history was a mitigating factor. On remand, the sentencing court should consider the seriousness of Mr. LeBeau's criminal history, in light of the

---

[7] The presentence investigator also scored Mr. LeBeau's criminal history on the sex offender matrix. It is unclear why this matrix was used because Mr. LeBeau was not convicted of a sex offense and there were no sexual overtones to the kidnapping he committed. Nevertheless, that matrix recommends that a defendant with Mr. LeBeau's criminal history be sentenced to fifteen years to life, with a recommended sentence of twenty-one years.

Sentencing Commission's guidelines, in order to determine whether it is considered a mitigating factor.

### C. The District Court Improperly Discounted Mr. LeBeau's Employment History

¶ 65   Mr. LeBeau argues that the district court failed to properly credit his employment history as a mitigating factor. The court refused to consider Mr. LeBeau's employment history as a mitigating factor because Mr. LeBeau was unemployed at the time he committed his crime. However, the presentence report makes clear that Mr. LeBeau was employed as a painter by the same employer from May 2005, until he was laid off in December 2008, only two months prior to his arrest. Though a defendant's employment status at the time of his crime is certainly a relevant factor, it is not solely determinative. In light of the severe economic recession that gripped the country in 2008, which was particularly devastating in the construction sector, the fact that Mr. LeBeau was laid off and had yet to find new employment within a two-month period cannot fairly be held against him. The district court erred when it relied solely on the fact that Mr. LeBeau was unemployed at the time he committed his crime. On remand, the court should consider the reasons for Mr. LeBeau's unemployment and the totality of his employment history when determining whether his employment history should be considered a mitigating factor.

### D. The District Court Improperly Discounted Mr. LeBeau's Family Support

¶ 66   The district court refused to consider Mr. LeBeau's family support structure as a mitigating factor because Mr. LeBeau "hadn't seen [his] mother or [his] sister for years at the time they came to testify at trial." Again, while a defendant's physical contact with his family is relevant, it cannot be determinative. Mr. LeBeau's family all resides out of state. In large part due to the expense of travel, prolonged physical separation of family members is a reality for many today. But with technological innovations, families can remain in close contact, even when physically separated. For example, Mr. LeBeau's mother told the presentence investigator that she and Mr. LeBeau talked on the phone monthly during the time he was in Utah. Again, the district court's focus on only one aspect of a potential mitigating factor was in error. On remand, the sentencing court should consider the full extent of Mr. LeBeau's family support and whether that can be considered a mitigating factor.

**CONCLUSION**

¶ 67   The court of appeals erred in affirming the district court's imposition of a sentence of LWOP under section 76-5-302 of the Utah Code.   The district court erred when it considered only those aggravating and mitigating circumstances recognized by the Sentencing Commission instead of broadly considering the interests of justice as required by subsection 76-5-302(4).   Though the district court is given broad discretion in sentencing decisions, that discretion must be exercised in light of the proper legal standards. Because the district court abused its discretion when sentencing Mr. LeBeau, we vacate Mr. LeBeau's sentence of LWOP and remand for further sentencing proceedings consistent with this opinion.

JUSTICE LEE, dissenting:

¶ 68   Utah law has long committed a range of sentencing decisions to the sound discretion of the trial judge. The statute at issue here, Utah Code section 76-5-302(3), appears to me to fall squarely within this discretionary sentencing regime. It does so by leaving the question of whether to impose a sentence of life without parole for aggravated kidnapping to the trial judge's assessment of the "interests of justice."

¶ 69   The majority turns that discretionary standard on its head. Instead of deferring to the historically broad discretion conferred on trial judges, the court interprets the "interests of justice" standard to require a sentencing judge to carefully consider specific factors that the court deems relevant to an assessment of the "proportionality" of a sentence and to the defendant's "potential for rehabilitation." *Supra* ¶ 55. I respectfully dissent. I find no basis in the statute for imposing this rigid framework—imported from constitutional jurisprudence in a case in which no constitutional challenge has been asserted—on a judge exercising discretion under section 76-5-302(3). I would interpret the statute to preserve the broad discretion long conferred on trial judges on matters of discretionary sentencing. And I would affirm the imposition of the sentence of life without parole in this case, under the highly deferential "abuse of discretion" standard of review.

I

¶ 70   In Utah as elsewhere, our law has long recognized a wide berth of discretion for judges exercising the important duty of

imposing a criminal sentence.[1] Such discretion is not without limits. But so long as the judge imposes a sentence within the range of punishments established by law, and based on an inquiry into the nature of the offense and of the offender, the law has long upheld the judge's prerogative of determining the appropriate sentence.[2]

---

[1] *See State v. McGee*, 2001 UT 69, ¶ 6, 31 P.3d 531 ("[D]istrict courts have wide latitude and discretion in sentencing"); *State v. Woodland*, 945 P.2d 665, 671 (Utah 1997) ("We traditionally afford the trial court wide latitude and discretion in sentencing."); *State v. Gerrard*, 584 P.2d 885, 886 (Utah 1978) (noting that "sentencing procedures, including the use of an evaluation, are clearly discretionary with the trial court," and explaining that "the exercise of discretion in sentencing necessarily reflects the personal judgment of the court").

[2] *See, e.g.*, *State v. Sanwick*, 713 P.2d 707, 708 (Utah 1986) ("Except for . . . constitutional restraints, the trial court has broad discretion in imposing sentence within the statutory scope. [The court] must be permitted to consider any and all information that reasonably may bear on the proper sentence for the particular defendant, given the crime committed." (internal quotation marks omitted)); *Gerrard*, 584 P.2d at 887 (sentence imposed by trial judge will not be reversed unless it is beyond the "proper statutory penalty for the offense" or unless it can be said that "no reasonable man would take the view adopted by the trial court"). *See also Dorszynski v. United States*, 418 U.S. 424, 431 (1974) ("[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end."); *United States v. Tucker*, 404 U.S. 443, 446–47 (1972) (acknowledging the trial judge's "wide discretion in determining what sentence to impose," including by "conduct[ing] an inquiry broad in scope, largely unlimited . . . as to the kind of information he may consider"; explaining that "a sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review"); *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir. 1989) ("Prior to passage of the Sentencing Reform Act, appellate review of sentences was unavailable unless they exceeded statutory limits, resulted from material misinformation or were based upon constitutionally impermissible considerations."); *United States v. Dazzo*, 672 F.2d 284, 289 (2d Cir. 1982) ("When the sentence imposed is within statutory limits, it is generally not subject to review unless the trial court relied on either material misinformation concerning the defendant or constitution-

(continued...)

¶ 71 With a few limited exceptions, the law has also long deferred to the trial judge's discretion in identifying the range of offense-based and offender-based considerations relevant to the ultimate decision as to where to fix the sentence within a statutory range.[3] For the most part, we have left it up to individual judges to

---

[2](...continued)
ally impermissible factors."); Carissa Byrne Hessick & F. Andrew Hessick, *Recognizing Constitutional Rights at Sentencing*, 99 Cᴀʟ. L. Rᴇᴠ. 47, 52 (2011) (noting that under discretionary sentencing regimes, the judge "conduct[s] a separate sentencing proceeding at which he . . . impose[s] a sentence within [a] statutory range based on his assessment of 'sentencing' characteristics," which encompass "any number of factors" relevant to the offense, such as "harm to the victim or the defendant's motive," and "facts about the offender himself"); Note, *More Than A Formality: The Case for Meaningful Substantive Reasonableness Review*, 127 Hᴀʀᴠ. L. Rᴇᴠ. 951, 952 (2014) (noting that prior to the era of sentencing guidelines reform, "judges enjoyed vast discretion to sentence defendants within a statutory range," and "sentencing appeals were allowed only under narrow circumstances" and were "unreviewable" "[a]s a practical matter"); Susan R. Klein, *The Return of Federal Judicial Discretion in Criminal Sentencing*, 39 Vᴀʟ. U. L. Rᴇᴠ. 693, 693 (2005) (establishing that under the traditional discretionary sentencing regime, sentencing judges "ma[k]e all of the moral, philosophical, medical, penological, and policy choices surrounding what particular sentence to impose upon a particular offender," making the sentencing judge the "master of his courtroom").

[3] *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (recognizing that "judges in this country have long exercised discretion . . . in imposing sentence *within statutory limits* in the individual case"); *Williams v. New York*, 337 U.S. 241, 246 (1949) (noting that "before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law"); Klein*, supra* note 2, at 697 (explaining that prior to sentencing guidelines reform, judges had "enormous and essentially unbridled authority to impose a sentence anywhere within the

(continued...)

make a personal assessment of the factors he deems relevant to the ultimate imposition of a sentence. And we have rooted that approach in the trust we place in the trial judge, who has first-hand interaction with the defendant and thus "the main responsibility for sentencing."[4]

¶ 72 Our Utah system of "indeterminate" sentencing circumscribes the trial judge's discretion to some degree. It does so by generally prescribing *indeterminate* sentencing ranges for various categories of offenses, with the ultimate amount of time served being decided not by the sentencing judge at the outset but by the parole board in subsequent hearings.[5] Under this system of indeterminate sentencing, for example, a second-degree felony is generally subject to a sentence of a prison term of one to fifteen years. UTAH CODE § 76-3-203(2). So a trial judge sentencing a defendant convicted on such a charge would not impose a specific sentence within the statutory range of one to fifteen years; he would simply impose a sentence of one to fifteen years, and the defendant's actual time served would be determined by a subsequent decision of the parole board.

---

[3](...continued)

legislatively prescribed range," and "possessed full discretion to consider any information about the offender and offense that they thought relevant and helpful in determining the appropriate sentence").

[4] *See Gerrard*, 584 P.2d at 887 (1978) (explaining that the trial court "has the main responsibility for sentencing" and "attempts to arrive at a proper sentence based on the facts and law before it").

[5] *See Padilla v. Bd. of Pardons & Parole*, 947 P.2d 664, 669 (Utah 1997) (explaining that the court sets "an indeterminate sentence as provided by statute" which continues until the maximum amount of time elapses unless the parole board "terminates or commutes the punishment or pardons the offender"); UTAH ADULT SENTENCING AND RELEASE GUIDELINES 1 (2013) ("An offender sentenced to prison is legally subject to the full length of the sentence pronounced by the sentencing judge. Ultimately, the final decision regarding the actual length of incarceration is the responsibility of the Board of Pardons and Parole: that decision may, or may not reflect the guideline recommendation, and may be up to the full length of the indeterminate range pronounced by the sentencing judge.").

¶ 73 But that does not mean that our judges do not exercise discretion. First, not all sentencing decisions are subject to the indeterminate sentencing regime, as this case illustrates. *See* UTAH CODE § 76-5-302(3) (leaving it to the judge to decide whether to impose a sentence of life without the possibility of parole for the crime of aggravated kidnapping). Second, even as to offenses that are subject to indeterminate sentences, the judge still is faced with discretionary judgments—e.g., whether to place a defendant on probation and/or suspend a prison sentence, whether to order that sentences on multiple offenses be served concurrently or consecutively, and whether to enter a conviction for a lower category of offense under Utah Code section 76-3-402. *See* UTAH CODE § 76-3-402(1) (authorizing sentencing court to enter a "judgment of conviction for the next lower degree of offense" upon determination that it would be "unduly harsh" to enter conviction at charged level); *id*. § 76-3-402(2) (authorizing court to "enter a judgment of conviction for the next lower degree of offense" if it "suspends the execution of the sentence and places the defendant on probation" and determines that it is in the "interests of justice" and the defendant is successfully discharged from probation and meets other conditions).

¶ 74 The process for exercising this discretion is regulated by statute and by rule. Under Utah Code section 77-18-1(7), "[a]t the time of sentence, the court shall receive *any* testimony, evidence, or information the defendant or the prosecuting attorney desires to present concerning the appropriate sentence." (Emphasis added.) This provision also requires that such "testimony, evidence, or information shall be presented in open court on record and in the presence of the defendant." *Id*. Rule of Criminal Procedure 22 is to the same general effect. It provides that "[b]efore imposing sentence the court shall afford the defendant an opportunity to make a statement and to present *any* information in mitigation of punishment, or to show any legal cause why sentence should not be imposed," and also that "[t]he prosecuting attorney shall also be given an opportunity to present any information material to the imposition of sentence." UTAH R. CRIM. P. 22(a) (emphasis added).

¶ 75 The point of these provisions is straightforward: Both the defense and the prosecution have the opportunity to make a presentation as to *any* considerations or information they deem relevant to sentencing; and the judge then exercises his broad discretion to impose a sentence based on the considerations he

deems most salient.[6] Appellate review of the sentencing judge's decision, moreover, is limited. A sentence imposed in accordance with the prescribed procedure is reviewed under an "abuse of discretion" standard of review.[7] And a judge may be deemed to have abused his discretion only if the appellate court determines (a) that he based his decision on considerations or information not properly presented,[8] or (b) that no reasonable judge would have entered such

---

[6] *State v. Sweat*, 722 P.2d 746, 746 (Utah 1986) ("[S]o long as basic constitutional safeguards of due process and procedural fairness are afforded, the trial court has broad discretion in considering any and all information that reasonably may bear on the proper sentence." (internal quotation marks omitted)). *See also* Klein, *supra* note 2, at 693 (noting that the judge in the traditional system of discretionary sentencing "held a sentencing hearing if he wanted one, . . . heard whatever evidence he felt relevant, and . . . made all of the moral, philosophical, medical, penological, and policy choices surrounding what particular sentence to impose upon a particular offender").

[7] *State v. Killpack*, 2008 UT 49, ¶ 18, 191 P.3d 17("[W]e review a trial court's decision to deny probation under an abuse of discretion standard and will overturn a sentencing decision only if it is clear that the actions of the [trial] judge were so *inherently unfair* as to constitute an abuse of discretion." (internal quotation marks omitted)); *Gerrard*, 584 P.2d at 887–88 (Utah 1978) ("Before this Court will overturn the sentence given by the trial court, it must be clear that the actions of the judge were so inherently unfair as to constitute abuse of discretion.").

[8] *See State v. Lipsky*, 608 P.2d 1241, 1248 (Utah 1980) (information in presentence report may not be considered in sentencing unless provided to the defendant for the purpose of review and response; holding that a "defendant's right to be sentenced on the basis of information that is accurate can be protected only if the pre-sentence report is disclosed to him prior to sentencing"). *See also* Note, *supra* note 2, at 952 & n.6 (noting that in traditional discretionary sentencing regimes, "judges enjoy vast discretion to sentence defendants within a statutory range" and that "sentencing appeals [are] allowed only under narrow circumstances," as where they result from "material misinformation" or are "based upon constitutionally impermissible considerations" (quoting *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir. 1989))).

a sentence under the circumstances.[9]

¶ 76   We have applied these standards in upholding the exercise of the discretion of a trial judge in making the decision whether to suspend a sentence on condition of probation. *See State v. Killpack*, 2008 UT 49, ¶ 191 P.3d 17, 23 (Utah 2008) (affirming decision to commit adoptive mother to prison instead of probation on conviction of child abuse homicide).[10] In affirming such sentencing decisions, we have confirmed that the trial courts have wide discretion, while explaining that the exercise of such discretion is not to be overridden on appeal absent a showing of abuse. *Baine*, 347 P.2d at 556; *Williams*, 149 P.2d at 642.

¶ 77   The sentencing judge's discretion as to the considerations relevant to sentencing is not unlimited. But its limits are found in the terms of the constitution. Thus, in *State v. Lipsky*, 608 P.2d 1241 (Utah 1980), we held that the information set forth in a presentence report may not be considered in sentencing unless it is provided to the defendant for the purpose of review and response. And we based that decision on principles of notice and due process, explaining that "fundamental fairness requires that procedures . . . in the sentencing phase of a criminal proceeding be designed to insure that the decision-making process is based on accurate information," and holding that a "defendant's right to be sentenced on the basis of

---

[9] *Gerrard*, 584 P.2d at 887 (Utah 1978) (explaining that "the exercise of discretion in sentencing necessarily reflects the personal judgment of the court and the appellate court can properly find abuse only if it can be said that no reasonable man would take the view adopted by the trial court"); *State v. Galli*, 967 P.2d 930, 939 (Utah 1998) (same); *State v. Branch*, 919 P.2d 1228, 1235 (Wash. 1996) (en banc) ("The length of an exceptional sentence will not be reversed as clearly excessive absent an abuse of discretion . . . . A sentence is clearly excessive if it is based on untenable grounds or untenable reasons, or an action no reasonable judge would have taken."); *Banks v. State*, 732 So. 2d 1065, 1068 (Fla. 1999) (explaining that sentencing discretion is only abused when "no reasonable person would agree with the trial court's decision").

[10] *See also Baine v. Beckstead*, 347 P.2d 554, 560 (Utah 1959) (affirming sentencing judge's decision not to suspend sentence and impose probation); *Williams v. Harris*, 149 P.2d 640, 641–42 (Utah 1944) (affirming trial court's decision to revoke an order suspending sentence).

information that is accurate can be protected only if the pre-sentence report is disclosed to him prior to sentencing." *Id.* at 1248.

¶ 78   We have also identified another limitation on sentencing in cases where such discretion is exercised in a manner interfering with the authority afforded to the Board of Pardons and Parole by statute and by the Utah Constitution. *See* UTAH CONST., art. VII, § 12 (recognizing authority of board to "grant parole . . . in all cases except treason and impeachments, subject to regulations as provided by statute"); UTAH CODE § 76-3-401 (allowing multiple sentences to be imposed consecutively if the judge considers, among other factors, the "rehabilitative needs of the defendant"). Thus, in *State v. Strunk*, 846 P.2d 1297 (Utah 1993), we reversed the imposition of consecutive sentences of a minimum of fifteen years for child kidnapping and nine years for aggravated sexual assault for a defendant who was sixteen years old at the time of his offense. *Id.* at 1300–02. In so doing, we held that such a sentence improperly deprived the parole board of the "flexibility" guaranteed it by statute and the constitution. *Id.* at 1301–02. And, in *State v. Smith*, 909 P.2d 236 (Utah 1995), we reversed a decision imposing consecutive sentences amounting to "a minimum mandatory life sentence" because it would "deprive the Board of Pardons of discretion to take into account defendant's future conduct and possible progress toward rehabilitation." *Id.* at 245.

¶ 79   Courts in other jurisdictions have identified additional factors that may not be considered at sentencing without running afoul of the constitution[11]—factors such as race,[12] national

---

[11] *See* Klein, *supra* note 2, at 693 & n.4 (indicating that in the traditional scheme of discretionary sentencing, there are "no standards to assist or confine the judge in making his determination;" listing as limited exceptions the following: "(1) a sentence imposed using constitutional criteria, such as race or political viewpoint, *Wayte v. United States*, 470 U.S. 598 (1985); (2) a vindictive sentence based upon a defendant's assertion of his constitutional right to appeal his conviction, *North Carolina v. Pearce*, 395 U.S. 711 (1969); and (3) a term of years or fine so excessive compared to the crime that it offended the Eighth Amendment's proportionality requirement, *Harmelin v. Michigan*, 501 U.S. 957 (1991); *United States v. Bajakajian*, 524 U.S. 321 (1998).").

[12] *United States v. Kaba*, 480 F.3d 152, 156 (2d Cir. 2007).

origin,[13] and gender.[14] Except in these limited circumstances, however, the law generally has left it to the sound discretion of the trial judge to decide what offense-based or offender-based considerations seemed most salient to the sentencing decision, and to impose a sentence based on his discretionary judgment in light of all of the considerations as he saw them.

¶ 80 The breadth of this sentencing discretion is not without controversy. The flipside of broad discretion is the potential for inconsistency. And that potential has generated a number of responses to the traditional regime of discretionary sentencing described above. One well-known response is the invocation of "sentencing guideline" schemes aimed at replacing the individual judge's discretion with a formulaic sentencing system adopted pursuant to sentencing reform initiatives.[15] Such schemes have been

---

[13] *Id.*; *see also United States v. Borrero-Isaza*, 887 F.2d 1349, 1355 (9th Cir. 1989); *United States v. Gomez*, 797 F.2d 417, 419 (7th Cir. 1986).

[14] *United States v. Maples*, 501 F.2d 985, 985–86 (4th Cir. 1974).

[15] *See* Klein, *supra* note 2, at 699 ("The indeterminate sentencing model began to unravel in the early 1970s, in response to criticism that the rehabilitation model was a failure and that indeterminate sentencing resulted in unwarranted disparities for similarly situated defendants based on such illegitimate considerations as geography, race, gender, socio-economic status, and judicial philosophy. The sentencing reform movement, utilizing guidelines drafted by a legislature or commission to tightly cabin judicial discretion, was thus born at the state and federal levels." (footnotes omitted)); Note, *supra* note 2, at 952–53 (explaining that "the sentencing reform movement of the 1970s and 1980s . . . was animated by a desire to eliminate the unwarranted disparities perceived to be caused by sentencing judges' unbridled discretion"). The majority's reaction to the discretion afforded by our legislature under Utah Code section 76-5-302(3) seems to me to be animated by concerns that parallel those of the sentencing reform movement that gave rise to sentencing guidelines in federal law and in various states. Such concerns are understandable. But if there is a problem, it is not in the statute at issue here; it is in the overall scheme that we have long adopted. I dissent from what I see as a piecemeal attempt at repeal or reform of our discretionary system of sentencing. If we are to embrace reform, we should do so comprehensively and carefully. And any such effort

(continued...)

adopted at both the federal and state level.[16] But although these efforts have been lauded by commentators concerned about the downsides of broad sentencing discretion, they have also met some detractors.[17] More significantly, the sentencing guidelines movement has also run into constitutional resistance, culminating in a United States Supreme Court decision striking down the "mandatory" application of the federal guidelines on Sixth Amendment grounds. *United States v. Booker*, 543 U.S. 220, 245 (2005).

¶ 81   Other responses to the traditional system of discretionary sentencing have come in the form of constitutional challenges in the courts. First was a challenge under the Eighth Amendment to the imposition of the death penalty, based on the allegation that

---

[15](...continued)
should start in the legislature, not in this court.

[16] *See generally Mistretta v. United States*, 488 U.S. 361 (1989) (discussing federal sentencing guidelines and upholding them against constitutional attack; concluding that guidelines do not amount to an unconstitutional delegation of legislative power nor a violation of the principle of separation of powers); Kevin R. Reitz, *Sentencing Reform in the United States: An Overview of the Colorado Law Review Symposium*, 64 U. COLO. L. REV. 645 (1993) (discussing sentencing reform efforts in the states); Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681 (1992) (discussing sentencing reform efforts under federal law).

[17] *See e.g.*, Freed, *supra* note 16, at 1690 (criticizing the United States Sentencing commission and its guidelines as "more complex, inflexible, and severe than those devised by any other jurisdiction" (footnotes omitted)); *id.* at 1686–87 (noting that soon after their enactment and implementation, the federal guidelines "provoked dismay and evasion in the federal courts and the bar" due to "a powerful sense that the guidelines dictate unjust sentences in too many cases," and that "[m]any judges [] conform[ed] to the guidelines with a deep sense of distress" due to their broad and rigid requirements); KATE STITH & JOSE A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS (1998) (arguing that the most profound deficiency of the federal sentencing guidelines is that they are unexplained, and therefore lawless, and calling for a return of sentencing discretion to federal judges without "bureau-cratic" rules).

discretionary sentencing as applied to the imposition of the death penalty led to arbitrary decision-making, perhaps leading to racial imbalances in the imposition of this sentence. That challenge culminated in the Supreme Court's per curiam decision in *Furman v. Georgia*, 408 U.S. 238 (1972), which resulted in a moratorium on the death penalty for a period of time in which the states were given time and some discretion to decide how to eliminate this arbitrariness. And the *Furman* decision in turn led to the decision in *Gregg v. Georgia*, in which the court lifted the moratorium after upholding the constitutionality of a system in which Georgia and other states fundamentally altered their traditional discretionary sentencing system by (a) bifurcating their proceedings in a manner separating the guilt and penalty phase, and (b) directing juries at sentencing stage to exercise their discretion under instructions limiting the death penalty to cases in which certain *aggravating* circumstances are found to outweigh *mitigating* circumstances. *Gregg v. Georgia*, 428 U.S. 153, 190–95 (1976).

¶ 82   The second main constitutional challenge to discretionary sentencing came in *Solem v. Helm*, 463 U.S. 277 (1983). In *Solem*, the Supreme Court struck down the imposition of a life sentence (under a recidivism statute) for a conviction of passing a "no account" check of $100. In so doing the court rejected the proposition that the Eighth Amendment is limited to the proscription of the sorts of "cruel and unusual punishments" decried as barbaric at the time of the founding of the constitution, and embraced in addition a principle of "proportionality." *Id.* at 285, 288, 290. That principle, as the majority notes, is one under which a court considering the constitutionality of a sentence under an Eighth Amendment challenge could assess the gravity of the offense at issue and the harshness of the penalty, the sentences imposed on other criminals in the same jurisdiction for similar offenses, and the sentences imposed for imposition of the same crime in other jurisdictions. *Id.* at 290–91.

¶ 83   The *Solem* standard, however, is not a generally applicable limitation on sentencing discretion. It is a constitutional standard, which is properly invoked only upon the assertion of an Eighth Amendment challenge to a given sentence.[18]

---

[18] In any event, the continuing viability of the *Solem* standard of proportionality is an open question in cases not involving the death

(continued...)

II

¶ 84   This history provides the background necessary for our interpretation of the sentencing discretion prescribed in Utah Code section 76-5-302(3). The statute is part and parcel of a longstanding system of discretionary sentencing. Section 76-5-302(3) seems to me to preserve that discretion. It does so by directing the judge to impose the sentence he deems consistent with his sense of the "interests of justice."

---

[18](...continued)
penalty. In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the court rejected an Eighth Amendment challenge to the imposition of a sentence of life without parole for possession of cocaine, holding that "mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Id.* at 994. And on the applicability of the *Solem* proportionality standard, the court was deeply splintered; it ventured no majority view. *See id.* at 979–85 (opinion of Scalia, J., joined by Rehnquist, C.J., concluding that *Solem* should be overruled and articulating an originalist view of the Eighth Amendment under which an "unusual punishment" is understood as a particular mode of punishment that was infrequently imposed, not one that was excessively lengthy in comparison to other punishments imposed for similar crimes); *id.* at 996–1005 (opinion of Kennedy, J., joined by O'Connor, J., and Souter, J., expressing disagreement with aspects of the *Solem* test—particularly the "intra- and interjurisdictional" comparison of sentences for comparable crimes—while expressing support for a "narrow proportionality principle"); *id.* at 1009–27 (opinion of White, J., joined by Blackmun, J., and Stevens, J., expressing support for the *Solem* standard and concluding that Harmelin's sentence was unconstitutional; asserting that the "narrow" proportionality principle favored by Justice Kennedy effectively "eviscerates" *Solem*, leaving only an "empty shell" in its place). Thus, after *Harmelin*, the general applicability of the *Solem* standard of proportionality is a matter of grave doubt, particularly in cases not involving the death penalty. *See* Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: Proportionality Relative to What?*, 89 MINN. L. REV. 571, 581–84, 588–89 (2005) (discussing the ongoing debate regarding the effect of *Harmelin* and subsequent cases on constitutional proportionality analysis).

¶ 85   The hazy terms of the statute seem to me to emphasize the breadth of the judge's discretion in sentencing. As used in our sentencing scheme and elsewhere, this phrase appears to be little more than a reinforcement of the court's broad discretion to impose a sentence that it deems appropriate in light of the relevant circumstances as perceived by the judge.

¶ 86   Most often, the notion of "interests of justice" is used to impart discretion for a judge to depart downward from a presumptive statutory sentence for a particular crime.[19] The implication, without more, is simply to reinforce the broad range of a judge's discretion. And the phrase's general use in other wide-ranging provisions of the code seems to reinforce this notion of broad discretion.[20]

¶ 87   I find no room in the statutory authority to impose a sentence "in the interests of justice" for the complex, detailed sentencing standards prescribed by the majority. Granted, the legislature does not always use "the phrase . . . in the same manner in all the[] different contexts" in which it appears in our code. *Supra* ¶ 28. But to me that only reinforces the understanding of this phrase as a general placeholder for a principle of broad judicial discretion — discretion that may be exercised in different ways in different contexts, but that is broad and not easily subject to reversal on appeal.

¶ 88   I agree that the current version of section 76-5-302(3) is not the equivalent of the now-repealed instruction to courts to impose a sentence for aggravated kidnapping based on a consideration of aggravating and mitigating circumstances identified by the Utah Sentencing Commission. *See supra* ¶ 32 (citing UTAH CODE § 76-5-302

---

[19] *See* UTAH CODE § 76-4-204(2) (conferring discretion on sentencing judge to impose lesser sentence for crimes of solicitation if the court finds that a lesser term is "in the interests of justice" and states the reasons for this finding on the record); *id.* § 76-5-301.1 (providing for downward departure in the "interests of justice" in child kidnapping cases); *id.* § 76-5-402(4) (rape); *id.* § 76-4-102(2) (murder); *id.* § 76-4-102(3) (); *id.* § 76-3-203.2(5) (use of dangerous weapon in offenses committed on or about school premises).

[20] *See* UTAH CODE § 78B-1-136 (establishing witness's right "to be detained only so long as the interests of justice require"); *id.* § 77-8a-1(2)(d) (requiring joint trial of co-defendants unless separate trials would be "in the interests of justice").

(2007)). But I would not draw that inference from the mere fact of *amendment* of the old scheme—much less from the fact that the legislature "had the means and knowledge" to require consideration of aggravating and mitigating circumstances if it intended to do so. *Supra* ¶¶ 31–32. After all, the mere fact of a legislative amendment tells us little or nothing about the reason for amendment—which could either be an intent to abandon the old scheme in favor of a different one, or simply a desire to reword the statute in equivalent or synonymous terms.[21] And the legislature's capacity to speak more clearly—here as almost always—tells us absolutely nothing. It's true, of course, that the legislature could have clearly reinforced the mitigating and aggravating factors imposed under prior legislation; but it also could have spoken more clearly the other way, expressly repudiating those terms. So the failure to speak more clearly gets us nowhere in the face of an ambiguity like this one.[22]

¶ 89 The majority presumes that any rejection of the old mitigation-aggravation construct must have been a preference for something even more restrictive. Thus, after announcing its conclusion that the statute is not "equivalent to the previous aggravating-and-mitigating circumstances language," the court assumes that the existing statutory standard must necessarily be more restrictive than the one it replaced. *Supra* ¶ 32. And it then proceeds to develop such a standard from the general "goals" stated

---

[21] *See Rahofy v. Steadman,* 2012 UT 70, ¶ 12 n.12, 289 P.3d 534 (identifying "stylistic changes" in legislative amendments that had "no substantive effect on our analysis"); *Gressman v. State*, 2013 UT 63, ¶ 63, 323 P.3d 998 (Lee, J., dissenting) ("[T]he key question . . . is whether the change under review is in fact material. Some legislative amendments are not. Some are aimed only at clarification, or at stylistic or semantic refinement.").

[22] *See In re Estate of Hannifin*, 2013 UT 46, ¶¶ 25–26, 311 P.3d 1016 (explaining that on "any matter of statutory construction of any consequence, it will almost always be true" that the legislature could have spoken more clearly, while indicating that such "failure to speak more clearly" tells us nothing of consequence to our interpretation of the language that it used); *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 75, 266 P.3d 702 (Lee, J., concurring) ("[O]ne can almost always imagine clarifying amendments cutting both ways . . . . It adds nothing analytically to hypothesize how Congress might have spoken with greater clarity. We instead must simply ask what Congress did say and interpret it as best we can.").

in our criminal code and from Eighth Amendment caselaw on proportionality in sentencing (under *Solem v. Helm*).

¶ 90   I find no basis for such a standard in section 76-5-302(3). Black's Law Dictionary defines "justice" as "[t]he fair and proper administration of laws." BLACK'S LAW DICTIONARY 942 (9th ed. 2009). Thus, the statutory direction to the court to impose the sentence it deems to be in the "interests of justice" is a straightforward reiteration of the judge's duty to decide what seems most "fair and proper." That cannot properly be construed to require the court to follow the rigid, detailed framework of aggravating and mitigating circumstances.

¶ 91   Instead, the terminology of the statute is a straightforward reiteration of the longstanding principle of broad sentencing discretion. Our opinion in *State v. Russell*, 791 P.2d 188 (1990), hammers this point home. There we rejected the notion that discretion in sentencing is a matter that may be "surrendered to a mathematical formula," and reiterated instead the wide-ranging discretion afforded to the sentencing judge. *Id.* at 192. And our articulation of the essence of that discretion is telling. We stated that the "overriding consideration" for a judge imposing a sentence "is that the sentence be *just.*" *Id.* (Emphasis added.)[23]

¶ 92   I would accordingly read the terms of the governing statute as a straightforward reiteration of the longstanding discretion afforded to the sentencing judge. And I would not deem those terms

---

[23] Sentencing law in other jurisdictions confirms the understanding of consideration of the interests of "justice" as a reference to broad sentencing discretion. *See United States v. Steiner*, 239 F.2d 660, 662 (7th Cir. 1957) (noting the longstanding principle of "judicial discretion" in sentencing, while explaining that it encompasses the judge's prerogative of imposing a sentence "upon such terms and conditions as the court deems best," or in other words terms consistent with "the *ends of justice* and the best interest of the public as well as the defendant"(emphasis added) (citation omitted))); *United States v. Danilow Pastry Co., Inc.*, 563 F. Supp. 1159, 1166 (S.D.N.Y. 1983) (noting that in "1925[,] when the first federal probation statute was enacted, every state had such a statute to give judges *discretion* to suspend overly harsh sentences *in the interests of justice*," and speaking of the need for the law to "devise flexible sentences" and to engage in "creative" sentencing "in the interests of justice" (emphasis added)).

to be overridden by the "general purposes" articulated in the preambular provisions of the criminal code. *Supra* ¶ 34. None of these purposes identify, much less attempt to define, the meaning of "interests of justice" in sentencing or even in our criminal law.

¶ 93   As the majority notes, section 76-1-106 does make a general reference to "justice" (though not "interests of justice"). *Supra* ¶ 34. But even that term is used only to prescribe a rather fuzzy canon of construction of the code—to direct the courts to construe it "according to the fair import of [its] terms to promote justice and to effect the objects of the law and general purposes of [s]ection 76-1-104." *Supra* ¶ 34. This general canon seems to me to have little or nothing to do with the question presented here—of the meaning of "interests of justice" in a sentencing statute.

¶ 94   The majority cites this provision as a basis for importing an analysis of the principles of proportionality and rehabilitation, since the third of the four general purposes identified in section 104 encompasses the prescription of "penalties which are proportionate to the seriousness of offenses and which permit recognition of differences in rehabilitation possibilities among individual offenders." UTAH CODE § 76-1-104. In light of this general reference to these principles, the court reads the "interests of justice" consideration in section 76-5-302(3) to *require* an individualized assessment of proportionality and rehabilitative potential in each case prior to the imposition of a sentence under this statute.

¶ 95   I cannot agree with this approach. The general purposes cited by the majority are purposes of *the criminal code*—not of trial judges exercising discretion in sentencing. Thus, the general purposes invoked by the court have no apparent connection to our interpretation of the "interests of justice" consideration in sentencing under section 76-5-302(3). That phrase, again, is a reinforcement of the judge's broad sentencing discretion. And the longstanding tradition of such discretion runs clearly contrary to the detailed review for proportionality and rehabilitative potential prescribed by the court.

¶ 96   The court's standard turns the above-recounted history on its head. Traditionally, the principal limits on the judge's discretion in sentencing have been constitutional in nature. Thus, except where limited by the Eighth Amendment, principles of due process, or otherwise, our law has long left it up to the judge to determine the considerations that seem most salient to him and to impose an appropriate sentence in light of those considerations. The court's

decision today inverts this inquiry. In a regime governed by highly discretionary standards, and in a case in which the defendant has *not* asserted a constitutional challenge to his sentence, the court nonetheless reverses the sentence and remands for an evaluation of considerations (of proportionality and rehabilitative potential) heretofore arising only in case of a constitutional challenge to a sentence.[24]

¶ 97   This will surely come as a shock to the district judge in this case, who could not possibly have imagined being reversed for not engaging an Eighth Amendment analysis of proportionality in a case where no one had ever invoked the Eighth Amendment. And I suppose it will even come as a shock to counsel for LeBeau, who are being granted broad license to challenge the presumptive sentence endorsed by the legislature on grounds they never advanced in the proceedings below and thus have not preserved.

III

¶ 98   For the above reasons, I would interpret the terms of section 76-5-302(3) to preserve the traditional, broad sentencing discretion long afforded to trial judges in Utah. Thus, I would note that before imposing a sentence in this case, the district judge was required by statute to "receive any testimony, evidence, or information the defendant or the prosecuting attorney desires to present concerning the appropriate sentence." UTAH CODE § 77-18-1(7). But beyond that, and except as foreclosed by the limitations of the Utah and United States Constitution, I would hold that the sentencing decision under section 76-5-302(3) was committed to the broad discretion of the judge to identify the considerations that he

---

[24] The majority's approach has no logical stopping point. If it is taken seriously and extended to its logical limits, today's decision may eventually be understood to require proportionality review of *every sentence* imposed in the courts of the State of Utah, since the "interests of justice" are at least presumptively relevant to *all* sentencing decisions. And even if the court's approach is limited to sentences imposed under statutes *expressly* calling for consideration of the "interests of justice," the impact of today's decision still will be sweeping, as that phrase is employed in a wide range of statutes cited above. *Supra* ¶ 20, notes 19 & 20. That sweeping extension would be troubling, as it would represent a broad judicial overhaul of the discretionary sentencing regime that our law has long adopted.

deemed appropriate in imposing a sentence that he deemed consonant with the "interests of justice." And I would affirm on that basis, as I see nothing in this record to suggest that he abused his sound discretion in imposing the sentence he selected.

¶ 99   I can understand a degree of discomfort with the sentence imposed on LeBeau. From what I can tell on the face of the cold record before us on this appeal, I suspect I may not have imposed the sentence that was handed down in this case. But sentences in Utah are not imposed on the basis of cold records. They are imposed by trial judges, who are informed by a wealth of understanding and firsthand experience that appellate judges lack. That is why our law affords those judges such broad discretion, and why we limit our review on appeal for the rare abuse of discretion.

¶ 100   I can also appreciate a degree of discomfort with the discretionary sentencing scheme that we have adopted in Utah. As I noted above, and as proponents of sentencing reform have been advocating for decades, the downside of discretion is the potential for arbitrariness.[25] And that potential is certainly troubling. My point is not to express a preference for a more regimented, guidelines-based approach to sentencing, or even disapproval of our existing regime. The tradeoffs between case-by-case discretion and guidelines-based sentencing formulas pose intractable dilemmas for policymakers, and my understanding of the matter is far too limited to feel confident in advocating for one over the other. Thus, my point is more narrow. It is simply that despite the limitations of our current regime, it is not our prerogative to remake it by judicial fiat. I dissent from a decision that strikes me as a baseless move in that direction.

——————————

[25] *See* Paul H. Robinson & Barbara A. Spellman, *Sentencing Decisions: Matching the Decisionmaker to the Decision Nature*, 105 COLUM. L. REV. 1124, 1136 (2005) ("[B]oth judges and juries are properly excluded as decisionmakers because of the disparity problem: To rely on either is to allow offenders brought before different decisionmakers to be subject to different punishment rules.").